NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

DAVID P., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.P., S.P., *Appellees.*

No. 1 CA-JV 18-0347
FILED 3-12-2019

Appeal from the Superior Court in Yavapai County
No. P1300JD201700055
The Honorable Anna C. Young, Judge

**AFFIRMED**

COUNSEL

Law Office of Florence M. Bruemmer, P.C., Anthem
By Florence M. Bruemmer
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Michelle R. Nimmo
*Counsel for Appellee Department of Child Safety*

_____

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Michael J. Brown joined.

_____

**P E R K I N S**, Judge:

**¶1**          David P. ("Father") appeals from a juvenile court order terminating his parental rights to A.P., born in 2005, and S.P., born in 2008 (collectively the "Children"). For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**¶2**          DCS removed the Children from Father's care on May 24, 2017, after the Yavapai County Sheriff's Office arrested him for allegedly murdering the Children's mother. DCS then petitioned the juvenile court for a dependency on May 26, 2017, alleging Father neglected or willfully abused the Children because he allegedly murdered their mother. The court ordered DCS to place the Children with their paternal grandparents, then found the Children dependent as to Father.

**¶3**          On June 1, DCS moved to terminate Father's parental rights to the Children on the grounds of neglect and willful abuse for the alleged murder of the Children's mother. DCS also alleged that termination would be in the Children's best interests because they were in an adoptive placement and termination would provide them stability and permanency. Meanwhile, the Children left the state for an extended trip to Ohio with their paternal aunt and uncle ("Aunt" and "Uncle" respectively). The juvenile court later ordered the Children be placed in the physical custody of Aunt and Uncle.

**¶4**          On July 31, the Children moved the juvenile court to appoint Aunt and Uncle as the Children's legal guardians and to dismiss the dependency. The Children alleged the likelihood of their adoption was remote or termination would not be in their best interests; they also alleged Father consented to the guardianship. On August 1, the juvenile court appointed a guardian *ad litem* ("GAL") for the children. The court separately found that both the Children and Father consented to appointment of Aunt and Uncle as permanent guardians, but DCS was "not willing to consider guardianship" at that time. Shortly after this, the relationship between DCS and Aunt and Uncle began to deteriorate.

**¶5** Aimee Thomas, a psychologist licensed in Ohio, examined the Children in late July and early August, issuing a report on August 21, 2017. She interviewed the Children and performed several cognitive, emotional, and mental health tests. Thomas concluded the Children were "resilient and functioning in a relatively adaptive manner," but nonetheless she diagnosed them with "Other Specified Trauma and Stressor Related Disorder." She also noted that the Children's "grief appears somewhat suspended." Thomas stated that the Children's placement with Aunt and Uncle was "the primary reason that [the Children] are functioning as adaptively as they are."

**¶6** Back in Arizona, DCS moved to withdraw its motion to terminate Father's parental rights on August 21; the juvenile court allowed withdrawal two days later. On August 25, Father entered a "plea of no contest" in response to the Children's motion to appoint Aunt and Uncle as permanent guardians, but at that time the GAL was "not in favor of a guardianship." The juvenile court held a hearing on the motion for guardianship, after which it denied the motion and ordered the Children's attorney to file a termination motion.

**¶7** The Children's attorney moved to terminate Father's parental rights on September 11, 2017, alleging Father consented to termination and that termination would be in the Children's best interests because it would free them to be adopted by Aunt and Uncle. After a hearing, the juvenile court granted the motion and terminated Father's parental rights to the Children. The court found that Father consented to termination and that freeing the Children to be adopted by Aunt and Uncle would be in their best interests. The court then clarified that the Children would remain in the legal custody of DCS until completion of the adoption.

**¶8** The rift between DCS and Aunt and Uncle grew worse after the termination, with DCS expressing concern to the court that the Children did not have enough contact with their maternal relatives. At a hearing in January 2018, DCS and the GAL alleged Aunt had used false names for the Children to have video chats with Father in violation of a no-contact order imposed by the court in the criminal case. At the same hearing, the juvenile court chided Aunt for her "angry outbursts in court hearings" and instructed Aunt's attorney to caution her that her behavior could jeopardize her role as placement. The attorney for DCS stated to the court that there were other placements available in Arizona, but that it was still weighing its options because the Children no longer wanted to live in Arizona.

¶9          After the January 2018 hearing, Aunt and Uncle informed DCS that they no longer wanted to be considered for placement or adoption. On March 23, 2018, the juvenile court ordered the Children to be returned to the physical custody of DCS in Arizona. During the move, DCS found letters from Father to each of the Children and to the Aunt, another violation of the no-contact order from the criminal case.

¶10          With the Children back in the physical custody of DCS in Arizona, and with Aunt and Uncle no longer willing to adopt them, the Children moved to vacate the court's order terminating Father's parental rights. *See* Ariz. R. P. Juv. Ct. 6; Ariz. R. Civ. P. 60; *Trisha A. v. Dep't of Child Safety*, 245 Ariz. 24, 34, ¶ 30 (App. 2018) (noting the superior court may vacate its severance order in limited circumstances). The court granted the motion, vacated the termination order, and appointed counsel for Father.

¶11          After a hearing on April 3, 2018, the court ordered the Children to return to their Aunt and Uncle until the end of the school year, but also ordered they begin having telephonic visits with a proposed licensed placement with old family friends ("Friends") in Wyoming. The court again ordered DCS to move to terminate Father's parental rights to the Children. The court also ordered the GAL to submit a proposed order for the Children to maintain contact with their maternal grandmother, and for DCS to refer the Children to Dr. James Thal, a licensed psychologist, for a best interests assessment. On April 13, the court adopted the GAL's proposed order mandating contact between the Children and their maternal grandmother at least once a week.

¶12          For his best interests assessment, Thal reviewed records from the case and interviewed the Children, and then issued the assessment on April 4, 2018. Thal concluded the Wyoming placement was the "best available option" for the Children and when they arrived there, "the focus must necessarily be on their development of a close and enduring relationship with their new parents." He opined that in order to build these new relationships, the Children's existing relationships with Father and Aunt "must become secondary." Finally, Thal stated that termination and adoption appeared to be in the Children's best interests.

¶13          DCS moved to terminate Father's parental rights on April 13, this time alleging that Father neglected or failed to protect the Children from neglect because he did not provide them with supervision, food, clothing, or shelter due to his incarceration. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-201(25)(a). DCS also alleged Father abused the Children, but later dropped this ground. Regarding best interests, DCS alleged termination

would benefit the Children because they were adoptable and termination would free them for adoption, even though an adoptive placement was not then known to DCS. It also alleged termination would benefit the Children "because it would remove them from the trauma of the murder trial," and that a continued relationship with Father would be detrimental to the Children because it would delay permanency and because their continued relationship with Father would "connect[] the children with [the] trauma of [a] murder trial."

¶14 DCS then moved the court to change the Children's physical custody to the Friends in Wyoming, who were already approved as non-relative foster parents by Wyoming authorities. *See* A.R.S. §§ 8-548 to -548.06 (Interstate Compact on the Placement of Children). The court ordered the Children to be transferred to the physical custody of the Friends at the end of the school year.

¶15 The juvenile court held the termination hearing on July 16, 2018, and heard the testimony of Christina Sanders, a DCS supervisor, and Tara Taylor, the case manager and a child safety specialist.

¶16 Sanders was an investigator for DCS when it removed the Children. She testified that the Children's mother was deceased, that Father was in jail, accused of murdering the mother, and that the court in the homicide case had imposed a no-contact order between Father and the Children. She also opined that termination would be in the Children's best interests because they needed permanency and stability.

¶17 Taylor testified that the Children were in a kinship, non-relative, licensed placement in Wyoming that was meeting the Children's needs. *See* A.R.S. §§ 8-501(A)(14), -514(B); *Jeff D. v. Dep't of Child Safety*, 239 Ariz. 205, 209–11, ¶¶ 17–27 (App. 2016) ("kinship" statutorily broader than "relative"). She further testified the current placement was willing to adopt the Children, but the Children were adoptable even if they were not adopted by the Wyoming placement. Specifically, Taylor testified "[t]here's no reason why they shouldn't be able to be adopted by anybody." Like Sanders, she also stated that termination would be in the Children's best interests because it would provide them stability and permanency.

¶18 The juvenile court issued an under-advisement ruling on August 13, 2018, in which it found by clear and convincing evidence that DCS had proven the statutory termination ground of neglect under A.R.S. § 8-533(B)(2) due to Father's incarceration. The court also found by a preponderance of the evidence that termination would be in the Children's

best interests because: it would further the case plan of adoption, which would provide them stability and security; it would remove the detriment of delaying permanency; and it would remove the detriment of reminding the Children "of the fact that Father is facing murder charges for allegedly killing their mother, with no reasonable prospect of reunification with Father for a period of years." The court noted that the older child did not consent to adoption by the Friends, but found that the child would benefit from termination regardless. Father appeals this ruling.

## DISCUSSION

**¶19**        On appeal, Father does not contest the statutory ground for termination, so we do not address it. Ariz. R. Civ. App. P. ("ARCAP") 13(a)(7) ("argument" must contain "contentions concerning each issue presented for review"); Ariz. R. P. Juv. Ct. 106(A) (ARCAP 13 applies to appeals from the juvenile court); *In re J.U.*, 241 Ariz. 156, 161, ¶ 18 (App. 2016) (issues not presented on appeal are generally waived). Instead, Father argues the juvenile court erred by finding termination was in the Children's best interests. "We review the court's termination determination for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings." *Sandra R. v. Dep't of Child Safety*, 809 Ariz. Adv. Rep. 11, ¶ 6 (Jan. 29, 2019) (citing *Mary Lou C. v. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004)).

**¶20**        Once the juvenile court has found one of the statutory termination grounds by clear and convincing evidence, "we can presume that the interests of the parent and child diverge." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 12 (2018) (quoting *Kent K. v. Bobby M.*, 210 Ariz. 279, 286, ¶ 35 (2005)). Before terminating parental rights, however, the juvenile court "shall also consider the best interests of the child." A.R.S. § 8-533(B). Termination is in a child's best interests if either: (1) the child will benefit from the termination; or (2) continuation of the parental relationship will be detrimental to the child. *Alma S.*, 245 Ariz. at 150, ¶ 13 (citing *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 16 (2016)). The court's primary concern in a best-interests analysis is the "child's interest in stability and security." *Alma S.*, 245 Ariz. at 150, ¶ 12 (quoting *Demetrius L.*, 239 Ariz. at 4, ¶ 15). In making this determination, the juvenile court considers the totality of the circumstances. *Alma S.*, 245 Ariz. at 150–51, ¶ 13.

**¶21**        Father argues the juvenile court erred in finding termination was in the Children's best interests because one of the Children is over 12 years old and has stated he will not consent to adoption by the Friends. *See* A.R.S. § 8-106(A)(3) (child 12 years or older must consent before adoption).

The child's unwillingness to consent to adoption, Father argues, renders him unadoptable and leaves him languishing in foster care unless he consents. According to Father, it cannot be in the Children's best interests for the court to put them in such a position.

¶22        Initially, we note that Father's argument applies only to the older child, as the younger child is below the statutory threshold to object to adoption. In any event, the court considered the totality of the circumstances and found the benefits of termination outweighed the drawbacks. *See Alma S.*, 245 Ariz. at 150–51, ¶ 13 (courts are not "free to disregard" evidence other than adoptability when considering child's best interests). The court found that denying the motion to terminate "would delay permanency, requiring the children to linger in care for an indeterminate period," and that continuing in dependency would remind the Children that their Father faced murder charges for the death of their mother "with no reasonable prospect of reunification with Father for a period of years." Reasonable evidence supports the court's conclusions.

¶23        Father's trial is not scheduled to begin until September 2020, more than three years after the court found the Children dependent as to Father. Even if Father is acquitted, the Children would remain dependent at least until the end of trial, delaying permanency. This also supports the court's conclusion that there is no reasonable prospect of reunification with Father for a period of years. Further, the Children spent months living in Ohio with Aunt and Uncle, only to be returned to Arizona, then once again shipped back to Ohio before moving to Wyoming. Termination would likely leave Children in their Wyoming placement for the foreseeable future. This reasonably supports the court's conclusion that termination will provide the Children stability, security, and permanency—things sorely lacking in their lives since their mother's death. On this record we cannot say the court abused its discretion in finding that the Children would benefit from termination in the totality of circumstances.

¶24        Finally, Father argues the juvenile court erred when it did not "explore[]" the possibility of a guardianship *sua sponte*. Father could have asked the juvenile court to appoint a guardian for the Children, but did not. A.R.S. § 8-872(A) (any party to a dependency may move the court to appoint a permanent guardian). As such, there was no pending motion to appoint a guardian for the Children when DCS filed its termination motion on April 13, 2018, and no party asked the court to appoint a guardian thereafter. We generally do not consider issues not raised before the trial court and decline to do so here. *City of Tucson v. Tanno*, 245 Ariz. 488, 494, ¶ 22 (App. 2018).

**CONCLUSION**

**¶25**     For the foregoing reasons, we affirm the juvenile court's order terminating Father's parental rights to the Children.



AMY M. WOOD • Clerk of the Court
FILED:  AA